# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 3, 2014

## STATE OF TENNESSEE v. STEVIE GIBSON

**Appeal from the Criminal Court for Shelby County**
**No. 12-02182    James Lammey, Jr., Judge**

---

**No. W2013-02015-CCA-R3-CD  - Filed August 19, 2014**

---

Stevie Gibson ("the Defendant") was convicted by a jury of two counts of second degree murder and one count of aggravated robbery.  The trial court merged the two murder convictions and sentenced the Defendant to serve an effective term of thirty-seven years' incarceration.  In this direct appeal, the Defendant challenges the sufficiency of the evidence and his sentence.  Upon our thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Criminal Court Affirmed**

JEFFREY S. BIVINS, SP. J., delivered the opinion of the Court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Stephen C. Bush, Shelby County Public Defender; Barry W. Kuhn, Assistant Shelby County Public Defender (on appeal); and Coleman Garrett (at trial), Memphis, Tennessee, for the appellant, Stevie Gibson.

Robert E. Cooper, Jr., Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Chris West and Sam Winnig, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Defendant was charged in May 2012 with the first degree premeditated murder and, alternatively, the first degree felony murder of the victim, Joshua Martin, committed in November 2011.  The Defendant also was charged with the aggravated robbery of the victim.

At the Defendant's ensuing jury trial, conducted in April 2013, the following proof was adduced:

Betty Zieba testified that the victim, Joshua Martin, was her son. At the time of his death, he worked as a department manager at Dillard's. The victim drove a black Camaro convertible. Zieba had been in the victim's car recently and knew that one of her debit cards was in its glove box. She also knew that the victim carried his driver's licenses,[1] his work keys, and his debit card in the car's console.

On cross-examination, Zieba stated that she was aware of her son's homosexuality. She had no knowledge of him arranging dates online.

James Dinkins testified that he lived in the apartment next door to the Defendant's. On November 7, 2011, Dinkins arrived home at about 11:15 p.m. At about 11:45 p.m., as he was watching television, Dinkins heard some "screaming." He opened his door to check on the commotion, and when he opened his door, he "heard the next door slam hard, boom. Just like that." Dinkins heard nothing further and did not call the police.

When Dinkins opened his door at about 7:00 a.m. the next morning, he saw the police and a body "laying at the door." He told the police about the noise that he had heard the night before.

Maurice Ingram, the Defendant's brother, testified that the Defendant called him at about 3:20 a.m. on November 8, 2011. The Defendant told him that something was wrong and asked him to come over. Ingram, who lived across the street from the Defendant, got dressed and walked over to the Defendant's apartment. The Defendant was standing outside and told Ingram that he had met someone online. This man came over to the Defendant's apartment, and they had sex. The man then asked to use the bathroom. After the man came out of the bathroom, the man walked into the kitchen, grabbed a knife, and tried to rob the Defendant. A struggle over the knife ensued, and the Defendant stabbed his visitor. Ingram asked the Defendant if the visitor was dead, and the Defendant stated that he did not know. Ingram called their father and sister and told them what had happened. After their father and sister came over, they called the police. Also at the apartment before the police arrived were Ingram's other brother, his mother, and his step-mother.

Ingram went into the apartment after he realized that his "three little cousins" were inside. Before the police arrived, Ingram and another of his brothers got the children and took them to Ingram's house. Ingram then returned to the Defendant's apartment. By that time, the police had arrived.

---

[1] Zieba explained that her son had more than one driver's license "because he was always losing them and he would find them."

Ingram saw the victim's body when he went into the apartment. He stated that the body was on the floor, partially covered with a blanket. The body was unclothed. He did not move or otherwise disturb the body.

On cross-examination, Ingram described the Defendant as a "great big brother." He stated that the Defendant had been the choir director at church and had attended college for two or three years. Ingram knew that the Defendant was homosexual. He described the Defendant as "cool, calm, and collective [sic]." On the night in question, Ingram saw a cut in the palm of the Defendant's right hand. When he asked the Defendant about it, the Defendant told him that, "when he was tussling with [the victim] with the knife he grabbed it to keep from sticking him and they tussled over the knife and that's how he got the cut on his hand." Ingram also noticed that a vase of flowers had been knocked to the floor.

On re-direct examination, Ingram stated that he was not aware that the Defendant had a conviction for resisting official detention. He also stated that he was not aware of whether the Defendant used crack cocaine.

Kirsty Kirby testified that she was the store manager of the Dillard's where the victim had worked. She promoted him from a sales associate to a sales manager in 2008. She explained that the victim had prior management experience and a college degree. The victim's annual salary at the time of his death was $42,000.

Kirby testified that the victim closed the store on the evening of November 7, 2011. She explained that the store closed at 9:00 p.m., and it generally took thirty minutes to close the store. Because the victim sometimes closed the store, he had a set of the store keys. Those keys were returned to her after the victim's death.

On cross-examination, Kirby stated that the victim had been the sales manager of the cosmetics department. Kirby did not socialize with the victim outside of the workplace.

Officer Gregory Patrick of the Memphis Police Department ("MPD") responded with Officer Benjamin Huff to the scene at about 4:30 a.m. November 8, 2011. In the front doorway of the Defendant's apartment, they found a body laying face down, "half covered in a sheet." After the Defendant told Officer Huff that he had stabbed the victim, Officer Patrick told Officer Huff to handcuff the Defendant and place him in their patrol car. They later took the Defendant to the police station.

Officer Benjamin Huff of the MPD testified that, while he and Officer Patrick were on the scene, the Defendant told him that he had stabbed the victim. After he took the Defendant into custody and was preparing his report, the Defendant told him that "it was

self-defense." The Defendant told Officer Huff that he had met the victim online and that, after the victim came over, the victim tried to rob him.

Officer Huff described the scene: "the body was wrapped from the head to the mid-torso lying face down. The rest of it was nude. We walked through the apartment. Just a lot of blood just, I mean, all around the apartment." He added that the Defendant had been wearing clean clothes when they took him into custody.

On cross-examination, Officer Huff reviewed his report and then recalled that the Defendant had told him that he and the victim had had sex and that the victim then tried to rob him. He told Officer Huff that the victim had a knife, they struggled over it, and the Defendant took the knife from the victim and stabbed him. The Defendant kept telling Officer Huff that it was self-defense.

On re-direct examination, Officer Huff stated that he did not recall the Defendant having any injuries. On re-cross examination, Officer Huff stated that the Defendant did not advise them that he was injured.

Officer Charles Cathey of the MPD stated that he worked in the crime scene investigation division. He responded to the scene and took photographs. Some of the photographs admitted into evidence depicted the victim's body, wrapped in bedclothes, lying next to a large plastic bin. According to Officer Cathey, there was a white bag in the bin that appeared to have blood on it.

In the kitchen, Officer Cathey found a knife in the kitchen sink. The knife appeared to have blood on it. He also found some credit cards and a driver's license on a windowsill in the kitchen. One of the credit cards had the victim's name on it. In the kitchen trash can, he found clothes that appeared to have blood on them. On the kitchen table, he found a set of keys that had earlier been identified as the victim's work keys. He also found another set of keys, which belonged to the victim's car. In the bathroom, the shower curtain appeared to have blood on it.

Sergeant Joe Stark of the MPD testified that he searched the victim's car at the crime scene. The car was locked and he opened it with the keys that had been found on the Defendant's kitchen table. He opened the glove box and found it empty except for "a couple of pieces of paper." He found the car's owner's manual in the front passenger seat. He found this "kind of strange, kind of like somebody had been through the car." He did not notice any blood in the car.

-4-

Officer Anthony Barbarotto of the MPD testified that he reported to the crime scene on November 10, 2011, to assist in the collection of evidence. He collected from the Defendant's apartment a shipping box with a label addressed to the victim.

Lieutenant Anthony Mullins of the MPD testified as an expert in blood stain pattern analysis. He examined the crime scene, including bloody clothes that were found there. He testified that his observations and examinations led him to the following conclusions:

> The conclusions that I reached at the overall crime scene is [sic] that it appears to me that the assault started in the kitchen and moved into the living room and into the entryway. I can't say for certain if the victim made it all the way to the front door to try and get out or not. There is blood evidence there that suggests that it came from a bleeding source in the entryway. Those big round stains, they don't necessarily come from holding something with blood on it. It comes from a source that's resupplying, a bleeding source. There's transfer blood stains on the light switch and doorknob of that door but that could come from either the victim trying to get out with blood on his hands or a suspect moving around with blood on his hands or her hands.

> Regardless, all the circles and squares and all you saw [in photographs depicting bloodstains he marked at the crime scene] are indications that an assault took place there and you can see a couple of different areas so there's movement and the victim is up and moving when the assaults occur. That's why you have them higher on the wall and lower on the wall. If the victim was on the floor and being beaten or stabbed repeatedly you would see that type of thing just above the floor and going upward from there. But the ones that we showed you are going downward from an upper point.

> And most of the stains were 4 to 5 feet up on the wall. So that seems to me the victim was moving through the living room and being assaulted as he's moving. Was he trying to escape? I can't say. Was he trying to go get help or get a weapon? I can't say what he was doing. I just can tell you that it appears the victim is moving through the apartment and being assaulted as he's moving but he never – it does not appear he ever got out of the apartment.

As to the bloody pants that were found at the scene, Lt. Mullins testified that blood stains indicated that someone's fingers had gone into the back pockets. Also, some of the victim's driver's licenses and credit/debit cards "had what appeared to be bloody thumbprints or fingerprints or transfers." He added that the pants had been found in the kitchen at some distance from the victim.

On cross-examination, Lt. Mullins stated that he did not know if the victim was wearing the pants at the time someone reached into the pockets or if it was the victim or someone else who reached into the pockets. He testified, "The thing I can tell you is that somebody with bloody, at least bloody fingers, went into those pockets. Now what they did and what they found, that I can't tell you." He also acknowledged that he did not know if the victim's driver's licenses and credit/debit cards had been in the pockets or if they had been picked up with bloody fingers from another location. Lt. Mullins also acknowledged that people other than police officers had been in the apartment before the police arrived and could have been responsible for some of the transfer bloodstains. Moreover, the transfer bloodstains he found at the entryway indicated that someone had left the apartment after the stabbing took place.

On re-direct examination, Lt. Mullins stated that there was evidence that blood on the scene had been "tampered with":

> There was a large plastic storage bin, not huge but it was about 2 feet deep. I guess you could say it was medium size but it had quite a bit of blood that had pooled inside. It was still liquid. A lot of blood and spatter around the edges with the blood inside the bottom of that plastic bin. The comforter had a lot of blood on it where it was wrapped around the victim. There was, like, large pillowcases that were around his feet and there was some transfer in the entryway. And some as I point out before is over the existing dripped blood, which means somebody was moving through that. There was [sic] some bloody footprints inside the entryway within that smeared blood so it looked to me like somebody was moving the victim through there or moving something through there that would have blood on it and a lot of blood on it. And where the victim was and where the tub was and I think it may have been in one of the photos, it appeared to me that maybe the victim had been over that at some point and bleeding into that. This is a large amount of blood. This isn't like just a little bit that spilled into it. This is a lot of blood dripping into this plastic bin. So it appeared to me that maybe there was some effort to move the body or conceal the amount of blood or get rid of some blood or something.

Lt. Mullins added that it was common for an individual who was stabbing someone else to also cut themselves on their finger.

On cross-examination, Lt. Mullins acknowledged that someone could be cut on their hand while trying to take a knife away from someone else.

Officer David Smith of the MPD took photographs of the Defendant after he had been taken into custody. He did not notice anything unusual as he was photographing the Defendant's hands. He also took photographs of the clothing the Defendant was wearing. Under his jeans, the Defendant was wearing red pajama pants. Officer Smith noticed what appeared to be blood on the pajama pants. Officer Smith collected the Defendant's jeans and pants and then used an "alternate light source" on the Defendant's upper body to detect blood evidence. He did not detect any blood evidence on the Defendant's upper body, including the Defendant's hands, in this manner.

Lieutenant Vivian Murray of the MPD testified that she was the case coordinator for this case. She interviewed the Defendant and took his statement. The Defendant told her that he had two cuts on the palms of his hands, and she had an officer take photographs of his hands. She saw the cuts at the base of the palm of the Defendant's hand(s),[2] and she stated that they were not bleeding. The Defendant did not complain of pain and did not ask for medical attention. He told her that he received the cuts "during the process of the act, [that] the edge of the knife blade nicked him on . . . the palm of his hand."

The Defendant's written statement was admitted into evidence. He explained that his three minor cousins were in the apartment with him that night, sleeping. He said that the "incident" occurred at approximately 11:30 p.m. to midnight. His statement included the following narrative:

> I met [the victim] online and we decided that he was going to come to my apartment. He came to my apartment and he had a box and some wine. He proceeded in my apartment through the door, set the stuff down, and sat on the couch and we got undressed and he proceeded to give me oral sex. During climax, he went to the restroom. I was getting dressed. I was kneeling down with my back to him. After he left out the restroom, he proceeded in the kitchen. Next thing I knew, I heard him say "Give me your wallet." I turned around and saw that he had a knife in his hand. I grabbed the knife from him and proceeded to stab him in the chest and then eventually I walked around behind him and I was constantly stabbing him. He fell down on his knees in front of the TV. He was just screaming. Then he proceeded towards the door and I stabbed him in his back again and the knife was stuck in his back. He opened the door and I slammed the door. Then that's when he fell down in the doorway and I took the knife out of his back and put it in the kitchen sink. Then I began trying to call my brother Maurice and I was calling my cousin

---

[2] It is unclear from the record whether the Defendant had a cut to each palm or two cuts to a single palm. The photographs of the Defendant's palms admitted into evidence are too blurry to discern any injuries.

too but neither one of them answered. Then at that point, I didn't even know his name. So that's when I proceeded to go through his pockets. At this point, he was lying on his stomach and his back was to me so I reached in his back pockets and that's when I found 2 identifications and 2 credit cards and a Wells Fargo business card. Then I turned him over on his back, went in his front pockets, and then took his clothes off him. Then I threw the clothes in the trash and I grabbed the comforter off the little small couch and wrapped him up in it. I went in my room and got the pillow case, put the pillow case on his two legs and wrapped his upper body in the comforter and paced the floor and then the floor was getting soaked with blood so I proceeded towards my front closet and got a plastic tote I keep my dog's food in and I proceeded to lay him across it so it can catch the blood but it took me a minute to get him up there cause he's much heavier than I am. He laid across the container for a couple of minutes and then it gave out. I tried about 4 times to get him on the tote, but it kept falling over. He fell back to the floor where he laid. I just kept on walking back and forth, constantly calling my brother and cousin. I scared [sic] and frantic to call my parents and I never called the police cause I had my cousin and the[m] in the bedroom and I didn't know what was going to happen to them cause their mom is in jail and their dad wasn't there and I didn't want them to end up in state custody like I've been. Some hours passed and my brother eventually answered his phone around 3:00 a.m. something and I asked him to come to the apartment now. I was standing on the balcony when he was walking up. So I proceeded to walk to the front door and by the time I opened the door, Maurice saw him laying there and started crying and asked me what happened. By that time, Maurice was on the phone with one of my little brothers that usually come to my house every night around that time cause that's when he's getting off work and then me and Maurice was standing outside. At some point, my mom and my sister Amelia came to my apartment and they were walking up with my brothers Lee and Maurice and I ran towards my mom and was crying. She was asking me what happened. She told me to sit down on the stairs so I was sitting on the stairs telling my mom what happened. I went and sat in my brother Lee's car and that's when my dad and his wife pulled up. My dad asked me why I hadn't called the police and that's when I told him about the kids being in the house. Then my dad and Maurice went back to my apartment and came out with the kids. Then I think Maurice was on the phone with the police. After Maurice was on the phone with the police, that's when my dad told me to go put on some warm clothes. That's when I went and put on the clothes I have on now and went and sat in the truck with him. The police pull up and my dad tell [sic] my mom to get out the truck and go get the police. That's when all of us started walking back towards the apartment. So the police was asking who apartment was it

and I informed them that it was me and my friend's apartment and they was like "Well, were you the one that found the gentleman?" and I was like "Yeah. I'm the one that stabbed him" and they proceeded to take me to the police car.

The Defendant explained that he prevented the victim from leaving the apartment because he "didn't want him to go outside with the knife in his back and all of the blood on him nor did I want him to fall over the rail." He reiterated that he did not call the police because of his minor cousins. Asked why he went into the victim's front pockets after he had retrieved the victim's identification from his back pockets, the Defendant stated that he "was looking for [the victim's] cell phone or something at that particular time." He stated that he wanted to try and contact someone who knew the victim. Asked why he stripped the victim, he stated, "Remorse. I took the clothes off because I felt sorry at that moment. I said 'Look what I've done' and I was throwing myself my own pity party. So I wrapped him up in a blanket and threw his clothes in the garbage." He did not attempt any first aid. The Defendant stated that he had smoked crack cocaine a couple of hours before stabbing the victim.

On cross-examination, Lt. Murray acknowledged that, during her conversation with the Defendant, the Defendant told her that he took the knife from the victim and "just lost it." The Defendant also told her that he had twice been treated for attempted suicide.

On re-direct examination, Lt. Murray clarified that the Defendant told her that he had gone through the victim's car after the stabbing and brought into his apartment a box from the car.

Dr. Marco Ross, a medical examiner at the Shelby County Office of the Medical Examiner, testified that he performed an autopsy on the victim. The victim was five feet, seven inches tall and weighed 167 pounds. Dr. Ross described the victim's injuries:

[T]here was a stab wound on his right cheek, another stab wound on the right side of the neck. There was a stab wound on the back of the head on the left side, another stab wound on the back of the head on the right side. On the back of the neck there were five stab wounds. There was on the chin an incised wound. On the front of the neck was another incised wound. And on the left side of the neck was yet another incised wound. And again, on the back of the neck in addition to the five stab wounds there was also an incised wound on the back of the neck.

On the chest there was a stab wound on the left upper part of the chest and another stab wound located on the left mid-front of the chest region. On the back there were eight stab wounds scattered over various areas,

-9-

predominantly of the upper to mid-back area. There were incised wounds or cut wounds on the palm of the left hand. In addition to all these injuries there was [sic] some abrasions or scrape marks on the forehead, some contusion or bruising on the right side of the nose as well as the right side of the upper lip, an abrasion or scrape mark on lower lip, some abrasions or scrape marks on the left side of the chin, a scratch on the right temple extending onto the right ear, several scratches on the neck just below the area of incised wound kind of above the base of the neck where it connects to the chest. There were two scratches on the front of the right arm. On the back of the left hand were some additional scratches and scrape marks and another scrape mark on the palm of the left middle finger.

Dr. Ross explained that

[a] stab wound . . . just means that the depth of the injury's penetration in the body exceeds the length of the defect on the surface of the skin, whereas an incised wound which is usually caused by more of a cutting action rather than a stabbing action, creates a defect that generally tends to be greater in length on the surface of the skin than the depth of penetration into the body.

Dr. Ross stated that three of the stab wounds – one in the front of the body and two in the back of the body – hit vital organs. Dr. Ross opined that the victim's cause of death was multiple stab wounds. He also opined that the victim's wounds were consistent with those which would be caused by the knife found in the Defendant's kitchen sink. Dr. Ross' autopsy report was admitted into evidence. The report reflected a "pathological diagnosis" of twenty-five stab and incised wounds.

The State rested its case-in-chief after Dr. Ross' testimony, and the defense presented no witnesses. The jury convicted the Defendant of second degree murder as a lesser-included offense of first degree premeditated murder as charged in the first count; second degree murder as a lesser-included offense of first degree felony murder as charged in the second count; and aggravated robbery as charged. After a sentencing hearing, the trial court sentenced the Defendant as a Range I offender to twenty-five years for each of the murder convictions and to twelve years for the aggravated robbery conviction. The trial court merged the two second degree murder convictions and ordered the Defendant to serve his sentences consecutively, for an effective term of thirty-seven years' incarceration. In this direct appeal, the Defendant challenges the sufficiency of the evidence and his sentences.

## Analysis

*Sufficiency of the Evidence*

### Second Degree Murder

The Defendant argues that the evidence was not sufficient to support his conviction of second degree murder. The State disagrees.

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citations omitted).

Second degree murder is statutorily defined as the knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1) (2010). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause

the result." Id. § 39-11-302(b) (2010); see also State v. Brown, 311 S.W.3d 422, 431-32 (Tenn. 2010) (recognizing that second degree murder is a result of conduct offense) (citing State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000)). However, a person is statutorily justified in using deadly force against another under certain circumstances:

> [A] person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
>> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>>
>> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>>
>> (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(2) (2010). The Defendant contends that the proof established that he stabbed the victim only after the victim threatened him with a knife and that, therefore, the State had the burden of proving beyond a reasonable doubt that he did not act in self-defense. The Defendant asserts that the State failed to meet this burden.

The Defendant is correct that, once the proof "fairly raised" the general defense of self-defense, "the burden shift[ed] to the prosecution to prove beyond a reasonable doubt that the defense does not apply." State v. Hawkins, 406 S.W.3d 121, 129 (Tenn. 2013). However, the jury is the ultimate fact-finder and retains the prerogative to reject a defendant's claim of self-defense. See State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). Upon this Court's review of a jury's rejection of a defendant's claim of self-defense, "in order to prevail, the defendant must show that the evidence relative to . . . self-defense raises, as a matter of law, a reasonable doubt as to his conduct being criminal." State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994).

In this case, the only proof of self-defense were the statements the Defendant made to others after he had stabbed the victim to death and the minor injuries to his hand(s). The jury also had before it uncontroverted proof that the Defendant stabbed the victim multiple times, including multiple times in the victim's back; that the victim was unarmed during the attack; that the Defendant prevented the victim from escaping the apartment after the Defendant began stabbing him; that the Defendant did not render any aid to the victim after incapacitating him; that the Defendant attempted to conceal evidence of the killing; that the Defendant did not call the police after he killed the victim but instead sought aid from his family members; and the Defendant's statement that he had smoked crack cocaine before the

attack and "lost it" during the attack. This proof was more than sufficient for the jury to reject the Defendant's claim that he had acted in self-defense. The Defendant's proof of self-defense does not raise, as a matter of law, a reasonable doubt that he committed the second degree murder of the victim. Accordingly, the Defendant is entitled to no relief from his second degree murder conviction on this basis.

## Aggravated Robbery

The Defendant also contends that the evidence was not sufficient to establish that he committed an aggravated robbery of the victim. Aggravated robbery is statutorily defined as the "intentional or knowing theft of property from the person of another by violence or putting the person in fear," Tenn. Code Ann. § 39-13-401(a) (2010), "[a]ccomplished with a deadly weapon," id. § 39-13-402(a)(1) (2010). In this case, the Defendant admitted to taking items of personal property from the victim's pockets after stabbing him to death with a knife. The Defendant also stripped the victim of his clothing and threw the victim's clothing away. These actions constituted theft of property from the victim's person by violence accomplished with a deadly weapon. This evidence was sufficient to support the Defendant's conviction of aggravated robbery. Accordingly, the Defendant is entitled to no relief from his aggravated robbery conviction on this basis.

### *Sentencing*

After a sentencing hearing, the trial court sentenced the Defendant as a Range I offender to the maximum term of twenty-five years for each of the murder convictions[3] and to the maximum term of twelve years for the aggravated robbery conviction.[4] The trial court merged the two murder convictions and ordered the sentences to run consecutively for an effective term of thirty-seven years' incarceration. The Defendant contends that the trial court erred when it imposed the maximum sentences for each offense and further erred in ordering the sentences to run consecutively. The State disagrees.

Prior to imposing sentence, a trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

_____

[3] Second degree murder is a Class A felony. Tenn. Code Ann. § 39-13-210(c). The maximum Range I sentence for a Class A felony is twenty-five years. Id. § 40-35-112(a)(1) (2010).

[4] Aggravated robbery is a Class B felony. Tenn. Code Ann. § 39-13-402(b). The maximum Range I sentence for a Class B felony is twelve years. Id. § 40-35-112(a)(2).

-13-

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections ] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010).

The referenced "principles of sentencing" include the following: "the imposition of a sentence justly deserved in relation to the seriousness of the offense" and "[e]ncouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs." Tenn. Code Ann. § 40-35-102(1), (3)(C) (2010). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(4), (5) (2010).

Our Sentencing Act also mandates as follows:

In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2010).

Additionally, a sentence including confinement should be based on the following considerations:

      (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

      (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

      (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1).

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). This same standard of review applies to a trial court's order of consecutive service. See State v. Pollard, 432 S.W.3d 851, 862 (Tenn. 2013) ("So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal.") (citing Tenn. R. Crim. P. 32(c)(1); Bise, 380 S.W.3d at 705). This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Bise, 380 S.W.3d at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

At the sentencing hearing, Betty Zieba, the victim's mother, testified about the impact her son's death had on her as well as on her daughter and grandson, whom the victim had lived with and supported. The State also introduced three victim-impact letters and the Defendant's presentence report. The presentence report reflected that the Defendant had two previous convictions, a misdemeanor weapons offense and a misdemeanor evading arrest offense, both committed in March 2010. The report also reflected that the Defendant was on probation at the time he committed the instant offenses. The Defendant reported that he

began using marijuana in 1999 and that, beginning in 2003, he used cocaine, "acid," and "prescription pills."

The Defendant testified and acknowledged that he stabbed the victim to death. He stated,

> I pray everyday, not only that I have peace, that [the victim's] family has peace because not only did I take their son away from them but I took myself away from my family. So I just pray that one day they'll find peace, you know, in what happened and one day they'll forgive me for what I done [sic] to their family.

The Defendant also testified about his "rough childhood," his several suicide attempts, and his drug abuse. He explained that, since he had been in confinement on the instant charges, he had obtained certificates of completion from the Shelby County Jail for an anger management program, an alcohol and drugs program, a life skills program, and an "MRT" program. The Defendant described the latter program as "Moral Reconation Therapy, which it gets to the root of the problem whatever you was [sic] dealing with."

On cross-examination, the Defendant stated that he killed the victim while he was under the influence of crack cocaine and that he "just really lost it."

In determining the length of the Defendant's sentences, the trial court noted the Defendant's "extensive record . . . of criminal behavior," including the Defendant's illegal drug use. The trial court also noted that the Defendant had treated the victim "with exceptional cruelty during the commission of the offense," that he "failed to comply with conditions of a sentence involving release into the community," that the Defendant used a deadly weapon during the commission of the murder, and that the Defendant committed the instant offenses while on probation. See Tenn. Code Ann. § 40-35-114(1), (5), (8), (9), (13)(c) (2010). The trial court determined that no mitigating factors applied, and, as set forth above, sentenced the Defendant as a Range I offender to the maximum terms available for both the second degree murder and the aggravated robbery convictions: twenty-five and twelve years, respectively.

In conjunction with determining the length of the Defendant's sentences, the trial court also stated the following:

> I think the intent here was robbery.
>
> And it may have been – it may not have been the initial reason why he had him brought over there, but I think perhaps that could explain why the jury

-16-

gave him a tremendous break. I agree with the defense in the fact that this is kind of nonsensical, except for our legislature decided to say that murder second degree is a lesser-included offense of murder perp. I still don't get it. I never will get that. But what I think really matters nothing at all. I think it's a silly law. I think if you commit the underlying offense and a death ensues, it doesn't matter what, it's a murder in the perpetration of a felony. Therein lies the rub here. That is the problem that I have with sentencing someone to less than the maximum on something like this.

What I believe after seeing the proof that he was guilty of murder in the perpetration of a felony which carries life and carries life, doesn't carry 25 years, it carries life. Now that's the problem I have.

So all these mitigating factors and enhancing factors I suppose cannot make up for the fact that I watched, saw this proof, and I think he was guilty of murder perp. So the jury gave him one heck of a break by finding him guilty of murder second degree.

. . . .

What is fair? What has to be deemed to be fair and appropriate and an appropriate sentence in a case like this? Does the sentence reasonably relate to the offense to which the defendant stands convicted[?]. Certainly I think 15 years would be – that would be – the victim would be victimized again. 15 years that would be an insult to the decent law-abiding citizens to this county and the State of Tennessee.[5]

So on the charge of murder second degree, I find that the only appropriate sentence under these circumstances, under these facts is 25 years and that's 100 percent crime.

I think the only sentence that would that would be appropriate for aggravated robbery under these circumstances and the factors that I've cited that apply would be 12 years.

As to whether the Defendant would serve his sentences concurrently or consecutively, the trial court ruled as follows:

---

[5] Fifteen years is the minimum Range I sentence for second degree murder. Tenn. Code Ann. § 40-35-112(a)(1).

Now as far as I find that the defendant is a dangerous offender whose behavior indicates little or no regard for human life. No one forced him to do crack cocaine. No one forced him to get this man to come over there. No one forced him to stab him, slash him 29 [sic] times. Anyone that would slash and cut someone 29 [sic] times is a dangerous offender.

It doesn't have to be his previous record. It doesn't have to be anything he's done. I can base that based upon these facts alone. Under these facts, to say that he was not a dangerous offender would be a decent – would be an affront to the decent law-abiding citizens of Shelby County as well.

Aside from the fact that there's so much murder and mayhem going on in our county, I don't think that really weighs into this. I think the fact that this particular crime, this particular defendant, these particular facts are particularly aggravated. The facts surrounding this offense are particularly aggravated, and I think that the aggregate length of sentences having them consecutive would reasonably relate to the offense for which the defendant stands convicted.

I believe that he should have gotten life. 37 years is going to have to do. So I believe that fair sentence under these circumstances, being that the jury gave him a tremendous break and an appropriate sentence would be a total of 37 years.

We turn now to consider the Defendant's challenges to the trial court's rulings about the length of his individual sentences and consecutive service.

## Length of Sentences

As set forth above, the trial court considered five enhancement factors in imposing the maximum terms for each of the Defendant's offenses. The record supports the trial court's consideration of each of these five factors. However, we are constrained to point out that the trial court's dissatisfaction with (1) the General Assembly's decision that second-degree murder is a lesser-included offense of first degree felony murder, see Tenn. Code Ann. § 40-18-110(g)(1) (Supp. 2011), and (2) the jury's verdict of second degree murder instead of first degree felony murder should have played no role in the trial court's sentencing decisions. Our sentencing statutes make no provision for a trial court, in effect, to increase the severity of a jury's verdict through the mechanism of sentencing. Yet, the trial court's remarks make clear that it was enhancing the Defendant's sentences on the basis of the trial court's conclusion that the proof supported a conviction of first degree murder rather than the lesser-included offense of second degree murder, the verdict returned by the jury. As the Indiana Supreme Court has recognized, "it is improper for a trial judge to

-18-

enhance a sentence based on his personal disagreement with the jury's verdict." Ellis v. State, 567 N.E.2d 1142, 1144 (Ind. 1991).

We are constrained to conclude that the trial court's strong reliance on his personal disagreement with the jury's verdict was not consistent with the purposes and principles of our Sentencing Act. Accordingly, the presumption of reasonableness fails. See Bise, 380 S.W.3d at 707 (adopting an abuse of discretion standard of review and "granting a presumption of reasonableness to within-range sentencing decisions *that reflect a proper application of the purposes and principles of our Sentencing Act*") (emphasis added). Nevertheless, we hold that the trial court did not abuse its discretion in imposing the maximum terms for each offense because, as we have already indicated, the record supports the trial court's consideration of the five enhancement factors referred to above. In light of these multiple enhancement factors, we hold that the record supports the trial court's imposition of twenty-five years for the Defendant's conviction of second degree murder and twelve years for the Defendant's conviction of aggravated robbery. See Carter, 254 S.W.3d at 346. Therefore, the Defendant is not entitled to relief from the length of his individual sentences.

## Consecutive Sentences

The trial court ordered the Defendant to serve his sentences consecutively upon finding him to be "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4) (2010). Our Supreme Court recently has determined that, although the Bise standard of review applies to a trial court's decision to impose consecutive sentencing, a trial court must also make additional findings of fact when imposing consecutive service on the basis of finding the defendant to be a dangerous offender. See Pollard, 432 S.W.3d at 863. Specifically, the trial court must determine, based on facts in the record, "that the aggregate sentence reasonably relates to the severity of the offenses and that the total sentence is necessary for the protection of the public from further crimes by the defendant." Id. (citing State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999)).

As to the first of these factors, the trial court stated, "The facts surrounding this offense [sic] are particularly aggravated, and I think that the aggregate length of sentences having them consecutive would reasonably relate to the offense [sic] for which the [D]efendant stands convicted." The trial court referred specifically to the Defendant's cocaine use prior to murdering the victim and to the numerous times that the Defendant stabbed and slashed the victim. However, the trial court made no findings about the necessity of protecting the public from the Defendant. Rather, the trial court stated, "I believe that he should have gotten life. 37 years is going to have to do." Again, the trial

court was attempting to remedy its frustration with the jury's verdict through an increased sentence. Consecutive service is not permissible on this basis.

In this case, as in <u>Pollard</u>, the trial court did not make all of the additional findings necessary in order to impose consecutive service on the basis of finding the Defendant to be a dangerous offender. We are satisfied, however, that the record contains an adequate basis for our de novo determination that the aggregate sentence is necessary to protect the public from further crimes by the Defendant. <u>See Pollard</u>, 432 S.W.3d at 863-64 (indicating that, "[w]here . . . the trial court fails to provide adequate reasons on the record for imposing consecutive sentences," an appellate court may "conduct a de novo review to determine whether there is an adequate basis for imposing consecutive sentences"). The record demonstrates that the Defendant sought out a sexual partner using the internet. Although the Defendant had never met the victim before, he invited the victim to come to his apartment. Within the safety of his own home, the Defendant engaged in sex with the victim, and then the Defendant viciously attacked the victim. Although the victim tried to escape the Defendant's apartment, the Defendant prevented the victim from leaving and proceeded to stab the victim to death. In conjunction with murdering the victim, the Defendant also robbed him. The Defendant blamed his conduct on being under the influence of crack cocaine. The Defendant was on probation when he murdered and robbed the victim.

We hold that the Defendant's obvious willingness to engage in the use of dangerous illicit drugs, to seek out and entice an innocent member of the public to his apartment, to then commit the robbery and murder of that person, all while on probation, demonstrate that an effective sentence of thirty-seven years is necessary to protect the public from further crimes by the Defendant. Accordingly, on the basis of our de novo review of the trial court's imposition of consecutive service, we hold that the Defendant is entitled to no relief from the consecutive service of his sentences.

## Conclusion

For the reasons set forth above, we affirm the trial court's judgments.

_____
JEFFREY S. BIVINS, SPECIAL JUDGE